The almost unbroken current of the testimony is, that the night was exceedingly dark and a violent gale, almost a hurricane, was blowing. The attempts of the Garry Owen to land, and the result of her attempts, are stated by A. P. Trousdale, a witness for libelant. He says, "After we made two or three unsuccessful attempts to land, I went to the hurricane roof with Captain Gillam, the master of the Garry Owen. While I was on the roof, she attempted to land just below Canal street. At that time the other pilot had just come on watch, and not making a successful landing, and coming in so rapidly, the captain had her backed out again. She went out, and the next attempt she made. was to land alongside the Mary Bell, and the wind and the eddy took her up so rapidly that they found she would sink the Mary Bell, or smash herself to pieces, and she was again backed out, her stern backed to the wind, and she came round against the Mary Bell's guard. Her stern landed against the Mary Bell's bow, and she landed against her. They then put a line out, and that line either broke or was not made fast at all, and the boat passed up with the eddy and the wind above the Mary Bell. The Garry Owen's wheel became unmanageable. She could not turn it. She then floated away by the stern. She went up and struck a barge or hay-boat that we were landed against there, and as she struck that, she drifted out into the stream in front of the Canonicus." She then, according to the same witness, drifted out to the middle of the stream, and by the aid of the Little Jerry was barely able to avoid a direct collision with the Canonicus, which she passed on the Algiers side. She then drifted below the Canonicus, and had got into the edge of the eddy on the New Orleans side, and was drifting up stream, when the Tyler came to her assistance. All the time after she became disabled she was blowing signals of distress. When the Tyler started for her she was in the neighborhood of the Canonicus, and the officers of the Tyler supposed, and had reason to suppose, that she was in imminent peril and demanded prompt succor. To save life, and for that purpose only, the captain of the Tyler swears that he went to the assistance of the Garry Owen. When he neared her, the evidence is positive that he gave orders to back his engine and that the order was promptly obeyed. Nevertheless, the Tyler still had head-way, and the Garry Owen was carried up by the eddy, and the two collided with each other. I have been able to find no fault in the captain and officers of the Tyler. It must be remembered that the Garry Owen had just made four ineffectual attempts to land, and that in making the last she had disabled her wheel and become helpless. If the Garry Owen had found it impossible to land at the wharf without serious damage to herself, how much more difficult was it for the Ty-

ler to approach her in mid-stream, where she was drifting helpless at the mercy of the wind and currents. The occasion was one which appeared to demand promptitude and haste in order to save human life. It so appeared to the officers and crew of the Tyler. During a night intensely dark, with a gale blowing, the Tyler was called by the signal of distress from the Garry Owen, to render her immediate and speedy help. No more difficult or dangerous feat of seamanship could be demanded of the Tyler than to approach promptly and speedily and lay alongside the Garry Owen, herself helpless and drifting at the mercy of wind and waves. Under such circumstances, when human life was or might reasonably be supposed to be in peril, the court, in case of disaster resulting from the effort to save life, ought not to measure the degree of skill and judgment displayed with scrupulous nicety: The Columbus [Case No. 3,043]; The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443.

I believe that the Tyler made the effort in good faith and with reasonable judgment and skill, and although the attempt resulted in the sinking of the Garry Owen, yet the Tyler ought not to be held responsible for the loss. Libel dismissed at libelant's cost.

---

GILMAN (WEBSTER v.). See Case No. 17,-335.

GILMAN (WONSON v.). See Case No. 17,-933.

GILMARTIN (GODFREY v.). See Case No. 5,498.

GILMORE (FULTON v.). See Case No. 5,-154.

---

## Case No. 5,447.

### GILMORE v. GOODRICH.

[Cited in Harding v. Whitney, Case No. 6,-052. Nowhere reported; opinion not now accessible.]

---

## Case No. 5,448.

GILMORE v. NORTH AMERICAN LAND CO. et al.

[Pet. C. C. 460.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1817.

FRAUDULENT CONVEYANCES — INTENT — PRESUMPTION—PURCHASER UNDER EXECUTION AGAINST PARTNER.

1. A conveyance is fraudulent, under St. 13 Eliz. c. 5, when the same is voluntarily made by the owner of the land, if land be conveyed, the grantor being indebted at the time it was executed; the conveyance must be made with intent to delay, hinder, and defraud creditors or others.

[Cited in McKee v. Jones, 6 Pa. St. 427.]
[Cited in Willis v. Whitsitt (Tex. Sup.) 4 S. W. 256.]

2. A fraudulent intent will in general be presumed, from the fact that the party conveying

[1] [Reported by Richard Peters, Jr., Esq.]